**SHRED–IT USA, INC. and Shred–It Canada, Inc., Plaintiffs,**

v.

**MOBILE DATA SHRED, INC., Michael Bohbot, Nitza I. Cruz, and Executive Mobile Shredding, Defendants.**

**No. 02 CV.1967(VM).**

United States District Court, S.D. New York.

Oct. 30, 2002.

---

Gabrielle Lisa Gould, Robert N. Holtzmann, Kramer, Levin, Naftalis & Frankel, New York City, for Shred —It USA, Inc., Shred —It Canada, Inc., Plaintiffs.

Kashif Molamusa, Kashif Molamusa, Esq., West Paterson, NJ, for Mobile Data Shred, Inc., Michel Bohbot, Defendants.

Michael Gross, Hackensack, NJ, for Nitza I. Cruz, Executive Mobile Shredding, Defendants.

### *DECISION AND ORDER*

MARRERO, District Judge.

Plaintiffs Shred–It USA, Inc. and Shred–It Canada, Inc. ("Shred–It"), brought this action under the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, asserting, among other things, claims for breach of contract, fraud, unfair competition and misappropriation of trade secrets. Shred–It's claims arise from an asset purchase agreement entered into by Shred–It and defendants Mobile Data Shred, Inc. ("MDS") and its principal, Michel Bohbot ("Bohbot"). The Court held a four-day bench trial in this matter ending on September 12, 2002. The Court's findings of fact and conclusions of law are set forth below.

### I. *FINDINGS OF FACT*

1. Plaintiffs Shred–It USA, Inc. and Shred–It Canada, Inc. (collectively "Shred–It") own and operate mobile document destruction businesses in the United States and Canada.

2. Defendant Mobile Data Shred, Inc. ("MDS") has operated a mobile document destruction business in and around New York, New York, the principal of which was defendant Michel Bohbot.

3. Defendant Nitza Cruz was employed by MDS as a vice president until at least September of 2000, at which time she formed a business known as Executive Mobile Shredding ("EMS"), through which Cruz continued to receive payment from MDS for services she rendered to MDS until at least January 6, 2002. EMS operates a mobile document destruction business in and around New York City, and services a number of shredding customers which, prior to Shred–It's purchase of MDS's assets described below, had been served by MDS.

4. Shred–It purchased the operating assets of MDS effective in January of 2002 through a written contract dated November 20, 2001 (the "Asset Purchase Agreement"). (Pls.' Exs. 1 and 27.) The closing on the purchase was scheduled for January 7, 2002, but the evidence at trial indicated that the transaction was completed in mid-January, 2002.

5. As part of the Asset Purchase Agreement, Bohbot and MDS agreed not to

directly or indirectly, either individually or in partnership or in conjunction with any person or persons ... (i) Carry on or be engaged in or concerned with or interested in or advise, lend money to, guarantee the debts or obligations of or permit his name or any part thereof to be used or employed by any person or persons engaged *in any shredding services* similar to the business then being carried on by the Corporation and its affiliates and subsidiaries within North America; (ii) Solicit, interfere with or endeavor to entice away from or solicit contracts, orders or business from, any person or persons having dealings with the Corporation or its affiliates or subsidiaries or any customer of the Corporation or its affiliates or subsidiaries

    . . . .

(Pls.' Ex. 1 at 28 and Pls.' Ex. 27 at 28 (emphasis in originals).)

6. At trial, Bohbot testified that after he entered into the Asset Purchase Agreement with Shred–It, he knew that he was not permitted to help Nitza Cruz operate a shredding business. (Trial Transcript ("Tr.") at 159.)

7. In Sections 3.01(a) and (e) of the Asset Purchase Agreement, defendants Bohbot and MDS represented and warranted to Shred–It that they had good title to all of the assets Shred–It was purchasing and that the assets were all "free and clear of all liens, charges, encumbrances and any other rights of others." (Pls.' Exs. 1 and 27.)

8. Sections 6.05 and 6.06 of the Asset Purchase Agreement provided that it was the entire agreement of the parties and that it could be modified or supplemented only in writing:

*Section 6.05 Entire Agreement*

This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements between the parties hereto with respect thereto. There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the parties other than as expressly set forth in this Agreement.

*Section 6.06 Amendments and Waiver*

No modification of or amendment to this Agreement shall be valid or binding unless set forth in writing and duly executed by both of the parties hereto and no waiver of any breach of any term or provision of this Agreement shall be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, shall be limited to the specific breach waived.

(Pls.' Exs. 1 and 27.)

9. The parties introduced three additional contracts that were related to the sale of MDS's assets to Shred–It: (a) a Promissory Note and associated Pledge of Term Deposit, dated November 2001;[1] (b) a Bill of Sale, dated January 7, 2002; and (c) a supplemental Memorandum of Agreement dated January 15, 2002 (the "Supplemental Agreement"). (Pls.' Exs. 1 and 27.)

10. In the Promissory Note, MDS agreed to pay Shred–It $200,000, plus interest at seven percent annually, in 36 equal monthly installments. Failure to make any payment when due made the

---

1. Both the Promissory Note and the Pledge of Term Deposit do not specify which day in November these agreements were executed.

entire principal balance due and payable, with interest. (Pls.' Exs. 1 and 27.)

11. The Pledge of Term Deposit required MDS to post a certificate of deposit as collateral to secure the Promissory Note. (Pls.' Exs. 1 and 27.) In the Supplemental Agreement, MDS agreed to post that term deposit on or before January 18, 2002. (Pls.' Ex. 1.)

12. The Bill of Sale provided that Shred–It would sell back to MDS certain truck boxes containing shredding equipment. (Pls.' Exs. 1 and 27.) That sale took place simultaneously with the closing on the Asset Purchase Agreement. MDS was to have possession of those trucks for the limited purpose of removing the boxes. (Tr. at 112–14.)

13. The Supplemental Agreement provided that Shred–It immediately would be assigned the titles of four trucks identified in that one-page agreement, but that it would register those titles on dates specified therein from January 31 through March 14, 2002. (Pls.' Ex. 1.)

14. As part of the consideration for all of the promises, purchases, and undertakings between the parties, Shred–It paid a total of $1,600,002 to MDS and Bohbot. (Pls.' Ex. 18.) MDS and Bohbot received the payments in the form of three checks and one wire transfer. One check was dated November 2001 and the other three payments were dated January of 2002. (Pls.' Ex. 18; Tr. at 448–49, 610–13.)

15. MDS provided shredding services to one of its multi-branch customers, Fleet Bank, following the closing on the Asset Purchase Agreement. (Tr. at 600, 641.)

16. MDS continued to seek to acquire shredding trucks and equipment after the Asset Purchase Agreement. Specifically, through a credit offer accepted by Bohbot on January 8, 2002, MDS sought lease financing for a mobile shredding truck and equipment from Bank of New York Leas-ing Edge Corporation (the "Bank of New York"). (Pls.' Ex. 2.)

17. Pursuant to a Master Lease signed by Bohbot for MDS on January 10, 2002, MDS agreed that the shredding truck and equipment to be acquired through financing from the Bank of New York Leasing Edge would be kept at the MDS offices at 1197 Randall Avenue in the Bronx, New York. (Pls.' Ex. 3.)

18. The Bank of New York had no knowledge that MDS might transport to and use in Israel the shredding truck that it was financing and it would not have agreed to finance the truck had Bohbot informed the company of such an intention. (Deposition of Christopher Cunningham, dated April 10, 2002, introduced at trial on September 12, 2002, at 70.) Bohbot and MDS did not produce any credible evidence that the Bank of New York or its affiliates would have provided credit for Bohbot to purchase trucks to be used in Israel.

19. After the closing on the Asset Purchase Agreement, at least as late as February 21, 2002, MDS allowed EMS to use one of MDS labeled trucks that had been sold to Shred–It to perform shredding services at Astoria Federal Savings Bank, which is located at the intersection of Fifth Avenue and Ninth Street in Brooklyn, New York. (Pls.' Ex. 25; Tr. at 400.) There was no credible evidence to contradict the eye-witness testimony at trial of Shred-it's investigator, Alex Espinosa, who stated that the truck left MDS's headquarters in the Bronx and that the shredding services were performed at or in front of a branch of the Astoria Federal Savings Bank located at that address. (Tr. at 400.) Nor was it disputed that the driver of the truck was an employee of EMS. Defendant Cruz testified that she had no reason to doubt that an MDS truck was servicing

Astoria Federal Savings Bank that day. (Tr. at 738–39.)

20. Defendant Bohbot testified that he told former MDS customers that Nitza Cruz had been "very good" to him and that she had opened her own business. (Tr. at 635.)

21. During late January and through February of 2002, MDS paid Cruz a total of $203,000. These payments were allegedly made to fulfill a promise Bohbot made that he would "take care of" defendant Cruz. (Tr. at 629.) Bohbot made that promise, which ultimately could amount to $250,000, a few days after the January 7, 2002 closing date on the Asset Purchase Agreement. (Tr. at 686.)

22. Over 90 percent of the $203,000 paid by MDS to Cruz was made by means of a wire transfer directly from MDS to ShredFast, a Washington company that sells shredding trucks and equipment. In late February or early March 2002, MDS wired $185,000 to ShredFast to pay for the purchase of a shredding truck for EMS. (Tr. at 209, 661–63, 686.) The remaining money was deposited into an EMS account to fund its shredding business. (Tr. at 689.)

23. The $185,000 payment by MDS to ShredFast for the EMS shredding truck came approximately two weeks after Bohbot allegedly told Cruz he "did not want to be involved" with her shredding business because he was concerned that such involvement would "create problems" with Shred–It. (Tr. at 626, 633–34, 639–40.)

24. When MDS wired the $185,000 to ShredFast, Bohbot was aware that it was to purchase a shredding truck for use by Cruz and EMS. (Tr. at 687–88.) Defendants presented no credible evidence that Bohbot may have believed that the truck would be used for recycling or any other purpose unrelated to shredding.

25. Although both Bohbot and Cruz testified that the payments by MDS to or for Cruz were intended as "severance," no taxes or other deductions were withheld. (Tr. 210–11, 692, 694.) No evidence was provided by Bohbot or MDS that they had a severance plan for employees or that any other employee received severance. According to the testimony of Cruz, and as shown on her tax returns (Pls.' Exs. 11 and 12), Cruz was not even an employee of MDS for more than a year prior to the post-closing payments by MDS and Bohbot; Cruz claimed instead to be an independent contractor doing business as EMS. (Tr. at 645.)

26. MDS also allowed its facility at 1197 Randall Avenue in the Bronx to house at least two shredding trucks that served some of its former customers after the asset sale in January of 2002. One truck bore the name "Mobile Shredding Service." That truck performed shredding services for the Skadden Arps law firm, a former MDS customer, at a building located at 4 Times Square, New York, New York on February 20, 2002, a job for which EMS invoiced and was paid by Skadden Arps. (Pls.' Exs. 25 and 29; Tr. at 707.) A second truck housed at the MDS facility at 1197 Randall Avenue was labeled "Mobile Data Shred." (Pls.' Ex. 25.) That truck was the one used to perform shredding at the Astoria Federal Savings Bank located at the intersection of Fifth Avenue and Ninth Street in Brooklyn, on February 21, 2002. (Pls.' Ex. 25.)

27. In the summer of 2002, a Shred–It employee called MDS and posed as a potential shredding customer. The MDS employee who received the call stated that although MDS no longer performed shredding services, it had an "affiliate" that "would be glad" to do the shredding. That person provided the telephone number of EMS, 1–800–SHRED80, and told the caller to ask for Nitza Cruz. (Pls.' Ex. 20.)

28. There was no evidence that MDS or Bohbot prohibited Cruz and EMS from using the MDS name or giving the impression that EMS was affiliated with MDS. In the non-compete provisions of the Asset Purchase Agreement, MDS agreed not to permit its name to be used by any person in the shredding business. (Pls.' Exs. 1 and 27.)

29. Bohbot and MDS also assisted Cruz and EMS in opening and operating a shredding business by allowing EMS and Cruz to introduce the EMS name to the MDS customers at least as early as December of 2001, when Certificates of Destruction bearing the EMS name were completed and later provided by MDS to customers for shredding jobs performed by MDS. (Pls.' Exs. 5 through 10.)

30. In addition to the above-referenced facts regarding the non-compete provisions, all of the evidence at trial established that MDS did not make any installment payments on the Promissory Note, nor did MDS post the security, as required in the Pledge of Term Deposit Agreement and the Supplemental Agreement. (Tr. at 448–50; Pls.' Ex. 1.)

31. MDS did not have clean title to all of the assets sold to Shred–It. On September 20, 2001, more than three months before it executed the Asset Purchase Agreement with Shred–It, MDS executed a Security Agreement by which it granted the Bank of New York a security interest in all of MDS's assets. (Tr. at 233–34; Pls.' Ex. 4.)

32. The amount owed by MDS to Shred–It, pursuant to the Promissory Note, is the principal balance of $200,000, plus interest at seven percent from February 1, 2002, through September 30, 2002, for a total of $209,333.

33. Bohbot's failure to honor the commitment to provide assets free and clear of all liens and encumbrances has exposed Shred–It to a lawsuit by the Bank of New York, which has claimed $677,000 against Shred–It in an action pending in the United States District Court for the Southern District of New York.

34. In reasonable reliance on the material representations made by MDS and Bohbot in the Asset Purchase Agreement and related agreements, Shred–It paid $1,602,000 to MDS and Bohbot as part of the consideration provided by Shred–It.

35. Cruz formally founded EMS in September of 2000. (Pls.' Ex. 15.)

36. The tax returns Cruz filed for the years 2000 and 2001 claim that EMS had activity and expenses in both 2000 and 2001, including $1,746 of advertising expense in 2001. (Pls.' Exs. 11 and 12.)

37. One activity in which EMS engaged in 2001 was the completion of Certificates of Destruction, which were presented purportedly by MDS to customers of MDS. (Pls.' Exs. 5 through 10.)

38. While working as an agent of MDS, Cruz had her fax machine set to show recipients that the fax originated from "Nitza Cruz at MDS." (Tr. at 730.) After she left MDS, when EMS began soliciting shredding business from MDS customers, Cruz did not have her fax machine changed (Tr. at 701, 722), thus recipients of faxes from Cruz and EMS continued to receive the fax origination designation "Nitza Cruz at MDS." (Pls.' Ex. 13.)

39. Cruz testified at trial that she sent letters to MDS customers within a week after ending her business arrangement with MDS to solicit their business to EMS. (Tr. at 652–53.)

40. After she terminated her services for MDS, Cruz kept and used a Rolodex containing name and contact information for former MDS customers that she had maintained while employed by MDS. (Tr.

at 652, 697.) This Rolodex was used by Cruz to send the EMS solicitation letters to MDS customers in January of 2002. (Tr. at 652.) Based on Cruz's testimony, it was unclear when she first began using this Rolodex and the full nature of the information that it contained.

41. After Cruz left MDS, EMS used forms and stationery of MDS. On some MDS forms, EMS placed adjacent stickers bearing its name and address. (Pls.' Ex. 14.)

42. EMS also established an internet website in 2002 that referenced Cruz's former affiliation with a major shredding company that had sold its business. Immediately following the reference to Cruz's former association, the EMS website added: "I will continue to serve our existing clients . . . ." (Pls.' Ex. 16.)

43. At least in February of 2002, EMS used a shredding truck bearing the MDS name and operated that truck from the MDS facility at 1197 Randall Avenue. (Pls.' Ex. 25.)

44. Cruz testified that she was aware that the shredding truck drivers operating from 1197 Randall Avenue were servicing customers of EMS, MDS, and Mobile Shredding Service. (Tr. at 650.) She stated that the companies were "networking" together. (Tr. at 650.)

## II. *CONCLUSIONS OF LAW*

### A. *BREACH OF CONTRACT BY BOH-BOT AND MDS*

■ 1. To prove a breach of contract claim under New York law, a plaintiff must establish (1) the existence of a valid contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages. *See Terwilliger v. Terwilliger,* 206 F.3d 240, 245–46 (2d Cir.2000) (quoting *First Investors Corp. v. Liberty*

*Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir. 1998)).

2. Shred–It entered into four valid contracts with Bohbot and MDS: (1) the Asset Purchase Agreement, dated November 20, 2002; (2) the associated Bill of Sale, dated January 7, 2002; (2) the Promissory Note and associated Pledge of Term Deposit, dated November 2001; (3) the supplemental Memorandum of Agreement dated, January 15, 2002. At trial, Shred–It adduced sufficient evidence to support a finding that MDS and Bohbot each had a legal capacity to form the contracts, there was mutual assent by each party to the terms of the contracts and there was proper consideration for each of the four contracts, namely that Shred–It would pay Bohbot $1,400,002 and lend him $200,000 in exchange for his performance and the performance of MDS under the contracts. *See* 22 N.Y. Jur.2d *Contracts* § 11 (2002) (citing cases).

■ 3. Although Shred–It performed under these contracts, Bohbot and MDS: (1) breached the Asset Purchase agreement by (a) engaging in shredding services in the New York area either "directly or indirectly" in conjunction with Nitza Cruz and/or EMS, after entering into the agreement (Pls.' Ex. 1 at 28 and Pls.' Ex. 27 at 28), (b) assisting Cruz with the operation of EMS and (c) failing to convey the assets specified in the agreement free and clear of all liens; and (2) breached the Promissory Note and associated Pledge of Term Deposit Agreement by failing to (a) make the payments required by the Note and (b) provide security for the Note. *See supra,* ¶¶ 15–31.

4. As a result of such breaches, Shred–It suffered damages in an amount to be determined after the presentation of additional evidence by the parties.[2] Such dam-

---

**2.** While Shred–It provided some evidence of damages at trial through the testimony of Jim

Thomson, vice-President of finance adminis-

ages may include, but is not limited to "the amount of loss sustained by [Shred–It], including opportunities for profit on accounts ... diverted through" the conduct of Bohbot and MDS. *Hyde Park Products Corp. v. Maximilian Lerner Corp.*, 65 N.Y.2d 316, 491 N.Y.S.2d 302, 480 N.E.2d 1084 (1985). With respect to lost profits, only those damages resulting from Bohbot and MDS's "willful solicitation" of Shred–It's customers may be recovered. *Id.*

## B. *FRAUD BY BOHBOT AND MDS*

■ 5. To prove fraud under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19 (2d Cir.1996) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995)).

■ 6. The evidence at trial established that when MDS and Bohbot entered into the Asset Purchase agreement in January 2002, they knowingly made misrepresentations of fact for the purpose of inducing Shred–It to enter into the agreement. More specifically, they represented that the assets being sold through the agreement were free and clear of all liens. Shred–It reasonably relied on such representations when it entered into the Asset Purchase Agreement.

7. As a result, Shred–It has suffered damages and will suffer further damages in the future. In particular, Shred–It is now exposed to a lawsuit for a claim of $677,000 in this District, initiated by the Bank of New York, as a result of the Bank of New York's lien on the MDS assets sold to Shred–It and purportedly conveyed with clear title. The nature and amount of damages that the Court will impose shall be determined after the presentation of additional evidence by the parties.

■ 8. The evidence at trial was insufficient to support Shred–It's second fraud claim, which is based on its contention that Bohbot and MDS did not intend to honor their promise to exit the shredding business in North America when they entered into the Asset Purchase Agreement. Even if the Court agreed with this assertion, it would not give rise to a cause of action under New York law. When a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Id.* (quoting *McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 574 N.Y.S.2d 58, 59 (2d Dep't 1991)). In the instant case, the representations by Bohbot and MDS about their intent to perform under the Asset Purchase Agreement are clearly not extraneous to the

---

tration at Shred–It (Tr. at 437–40), and through an EMS account ledger covering the period from January 2002 through July 2002 (Pls.Ex. 17), the Court is not persuaded that Thomson's analysis and Shred–It's proposed damages are fully supported by a preponderance of the evidence on the record. For example, Shred–It must substantiate how Thomson arrived at a contribution margin of 61 percent. (Tr. at 439.) Furthermore, although Shred–It claims that it is entitled to

rescission and restitution, compensatory damages and a permanent injunction due to the contractual breaches by MDS and Bohbot, such an award would be improper. The Court will not rescind the Asset Purchase Agreement and enforce its terms at the same time. Shred–It must elect between alternative remedies, so as to prevent double recovery for the same harm. *See U.S. v. Thomas*, 709 F.2d 968, 971 (5th Cir.1983); *In re Wyatt*, 6 B.R. 947, 951–52 (Bankr.E.D.N.Y.1980).

terms of that agreement. As a result, such representations can not support a fraud claim.

### C. TORTIOUS INTERFERENCE WITH CONTRACTS BY CRUZ AND EMS

■ 9. Under New York law, to prevail on a claim for tortious interference with contract, a plaintiff must establish: (1) the existence of a valid contract between plaintiff and a third party, (2) defendant's knowledge of the contract, (3) defendant's intentional inducement of the third party to breach the contract, and (4) damages. *See Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289, 292 (1993).

■ 10. The evidence at trial established that (1) Bohbot and MDS agreed not to: (a) compete with Shred–It or (b) assist others to compete with Shred–It; and (2) Cruz was aware of this agreement. However, it was not clear that Cruz engaged in any act "with the purpose of inducing [Bohbot] to breach [his] contract" with Shred–It. *Imtrac Industries, Inc. v. Glassexport Co., Ltd.*, No. 90 Civ. 6058, 1996 WL 39294, *7 (S.D.N.Y. Feb. 1, 1996). Rather, the evidence at trial suggested that Bohbot, who employed Cruz and her company, made an independent decision to breach the non-compete provisions of the Asset Purchase Agreement by continuing to perform shredding himself, directly or indirectly, and by assisting Cruz obtain shredding clients for EMS. Furthermore, even if Cruz did somehow induce Bohbot to breach the non-compete provisions of his agreement with Shred–It, there was insufficient evidence that she used malicious or "wrongful means," an element required under New York law for a plaintiff to recover on a tortious interference with contract claim. *See Guard–Life Corp. v. S. Parker Manufacturing Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445, 448–49 (1989); *accord NBT Bancorp Inc., et al v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 495–96 (1996).

### D. MISAPPROPRIATION OF TRADE SECRETS BY CRUZ AND EMS

■ 11. To succeed on a claim for the misappropriation of trade secrets under New York law, a plaintiff must demonstrate: (1) that it possessed a trade secret, and (2) that the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999) (citing *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.1993)). Although "a customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret," *id.* at 44, in the instant case, Shred–It presented insufficient evidence that the Rolodex Cruz kept at work constituted such a "customer list" or a trade secret. At trial, there was neither evidence that Cruz was prohibited from taking the Rolodex in question when she left MDS, nor that the information that it contained was confidential. Furthermore, even if the Court were to consider the information in Cruz's Rolodex a trade secret, Shred–It presented insufficient evidence that she obtained the information through "breach of an agreement" or "improper means." *North Atlantic Instruments*, 188 F.3d at 44. Unlike the defendant in *North Atlantic Instruments*, Cruz had not entered into an employment agreement that specifically prohibited her from using the information in her Rolodex after she left MDS.

### E. DECEPTIVE TRADE PRACTICES BY CRUZ AND EMS

■ 12. Under New York General Business Law section 349 ("Section 349"), to prevail on a claim for deceptive trade

practices, a plaintiff must establish that: (1) the alleged practice was misleading in a material respect; and (2) the claimant was injured. *See P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*, 198 F.Supp.2d 466, 473 (S.D.N.Y.2002); *Steinmetz v. Toyota Motor Credit Corp.*, 963 F.Supp. 1294, 1306 (E.D.N.Y.1997) (citing *Jones v. Wide World of Cars, Inc.*, 820 F.Supp. 132, 138 (S.D.N.Y.1993)).

13. In the instant case, Shred–It failed to establish that Cruz engaged in a "deceptive practice" within the meaning of Section 349. Although the evidence suggested that Bohbot and Cruz may have attempted to create the impression that MDS and EMS were affiliated, Shred–It presented insufficient evidence for purposes of this cause of action to support its claim that customers were actually confused. Furthermore, as a company that competes with EMS, Shred–It is not within class of persons that Section 349 was designed to protect. *See Genesco Entertainment, Inc. v. Koch*, 593 F.Supp. 743, 751 (S.D.N.Y.1984) ("The typical violation contemplated by [Section 349] involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising."). Shred–It failed to establish that the conduct of Cruz or EMS had significant "ramifications for the public at large." Accordingly, the evidence does support its claim for deceptive trade practices. *See id.* at 752; *see also New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 770 (1995) ("[P]arties claiming the benefit of [Section 349] must, at the threshold, charge conduct that is consumer oriented").

## F. UNFAIR COMPETITION BY CRUZ AND EMS

14. New York unfair competition law "encompasses a broad range of unfair practices generally described as the misappropriation of the skill, expenditures and labors of another." *Diversified Marketing, Inc. v. Estee Lauder, Inc.*, 705 F.Supp. 128, 131 (S.D.N.Y.1988) (citing *Ideal Toy Corp. v. Kenner Products, Etc.*, 443 F.Supp. 291, 305 (S.D.N.Y.1977)); *see also Roy Export Co. v. Columbia Broadcasting System*, 672 F.2d 1095, 1105 (2d Cir.1982) (New York law recognizes as unfair competition the "misappropriat[ion] for the commercial advantage of one person . . . a benefit or property right belonging to another.") (quoting *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 489 (1950)). To prove that a particular defendant has engaged in "misappropriation," a plaintiff must establish that: (1) the defendant obtained access to its idea or product through an abuse of a fiduciary or confidential relationship with the plaintiff or via some sort of fraud or deception, *see Warner Bros. v. Gay Toys, Inc.*, 513 F.Supp. 1066, 1069 (S.D.N.Y.), *rev'd on other grounds*, 658 F.2d 76 (2d Cir.1981); and (2) that the defendant's use of the idea deprived the plaintiff of the opportunity to reap its due profits on the idea or product, *see Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F.Supp. 154, 160 (S.D.N.Y.1980).

15. In the instant case, the evidence established that, after Bohbot sold the assets of MDS and the goodwill of its name to Shred–It, Cruz and EMS improperly sought to provide former MDS customers with the impression that EMS was affiliated with MDS. EMS used clearly labeled MDS trucks to perform shredding services and MDS and EMS collaborated to refer incoming business to EMS.

16. As a result of this conduct, Shred–It suffered damages in an amount to be determined after the presentation of additional evidence by the parties.

## G. *INJUNCTIVE RELIEF*

17. To obtain a permanent injunction, a plaintiff must establish that it will be subject to irreparable injury and that there is an inadequacy of legal remedies. *Subaru Distributing Corp. v. Subaru of America, Inc.,* No. 98 Civ. 5566, 2002 WL 413808, *30 (S.D.N.Y. March 18, 2002) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) and *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989)). A district court has broad discretion in determining whether an equitable remedy is appropriate. *See Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 68 (2d Cir.1999). However, an injunction is an extraordinary remedy and is not to be routinely granted. *Weinberger,* 456 U.S. at 312, 102 S.Ct. 1798. Before ordering an injunction, a district court must balance the interests of the parties who might be affected by the court's decision. *See id.; see also Ticor Title Ins. Co.,* 173 F.3d at 68.

18. Based on the evidence presented at trial, the Court concludes that (1) there is a significant probability that Bohbot and MDS will continue to breach the non-compete and other provisions of the Asset Purchase Agreement; (2) such conduct will cause irreparable financial harm to Shred–It's business; and (3) such harm cannot be fully compensated with legal remedies because the extent to which Bohbot and MDS may breach the agreement in the future is uncertain. Balancing the interests of the parties, the Court concludes that a permanent injunction against Bohbot and MDS to prevent future breaches of the Asset Purchase Agreement is warranted.

19. With respect to Cruz and EMS, the Court concludes that (1) there is a significant probability that they will continue to engage in unfair competition by using MDS's name and collaborating with MDS and Bohbot to obtain additional customers that were formerly serviced by MDS; (2) such conduct will cause irreparable financial harm to Shred–It's business; and (3) such harm cannot be fully compensated with legal remedies because the extent to which Cruz and EMS may unfairly compete in the future is uncertain. Balancing the interests of the parties, the Court concludes that a permanent injunction against Cruz and EMS to prevent them from engaging in unfair competition in the future is warranted. In spite of this finding, the Court concludes that it is inappropriate to enjoin Cruz and EMS from servicing the customers that they have already obtained by collaborating with MDS as of the date of this Decision and Order. Instead, with respect to the current customers improperly obtained by Cruz and EMS, the Court concludes that any injury Shred–It may have suffered as a consequence can be remedied by awarding compensatory damages.[3]

## III. *CONCLUSION AND ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that Shred–It provide the Court with additional evidence of damages no later than November 15, 2002; and it is further

---

3. In a letter, dated September 27, 2002, which was enclosed with Shred–It's proposed findings of fact, Shred–It stated that its proposed findings supported a number of claims, all discussed above. The letter, however, did not mention Shred–It's claims for unjust enrichment against Cruz and conversion against Cruz, EMS and MDS. Regardless of whether this was an oversight, the Court concludes that the evidence at trial did not support these claims.

**ORDERED** that defendants provide responses, if any, to such evidence no later than December 6, 2002; and it is further

**ORDERED** that Shred–It provide the Court with proposed orders for permanent injunctions against (1) Bohbot and MDS and (2) Cruz and EMS no later than November 15, 2002; and it is further

**ORDERED** that defendants provide objections, if any, to such proposed injunctions no later than December 6, 2002.

**SO ORDERED.**