**SHRED–IT USA, INC. and Shred–It Canada, Inc., Plaintiffs,**

v.

**MOBILE DATA SHRED, INC., Michael Bohbot, Nitza I. Cruz, and Executive Mobile Shredding, Defendants.**

No. 02 Civ.1967(VM).

United States District Court, S.D. New York.

Dec. 27, 2002.

Gabrielle Lisa Gould, Robert N. Holtzman, Kramer, Levin, Naftalis & Frankel, New York City for plaintiffs.

Kashif Molamusa, West Paterson, NJ, for Mobile Data Shred, Inc., Michael Bohbot, defendants.

Michael Gross, Hackensack, NJ, for Nitza I. Cruz, Executive Mobile Shredding, defendants.

## DECISION AND ORDER

MARRERO, District Judge.

### I. BACKGROUND

Plaintiffs Shred-it USA, Inc. and Shred-it Canada, Inc. ("Shred–It"), brought this action under the Court's diversity jurisdiction asserting claims for breach of contract, fraud, unfair competition, tortious interference with contracts, misappropriation of trade secrets, and deceptive trade practices. These claims arose from an asset purchase agreement (the "Asset Purchase Agreement") between Shred–It and defendants Mobile Data Shred, Inc. ("MDS") and its principal, Michel Bohbot ("Bohbot") entered into on November 20, 2001 and closed in mid-January 2002. Following a bench trial on these claims, the Court issued a Decision and Order dated October 30, 2002 setting forth its findings of fact and conclusions of law. *See Shred–It USA, Inc. v. Mobile Data Shred, Inc.,* 228 F.Supp.2d 455 (S.D.N.Y.2002).

The Court found: (1) MDS and Bohbot liable on Shred–Its's claims for breach of contract and fraud, *see id.* at 462–64, and (2) defendants Executive Mobile Shredding ("EMS") and its principal, Nitza Cruz

("Cruz") liable on Shred–It's claim against them for unfair competition. *See id.* at 465–66. The Court determined that Shred–It's trial evidence failed to establish claims against EMS and Cruz for tortious interference with contracts, misappropriation of trade secrets, deceptive trade practices, conversion or unjust enrichment. *See id.* at 464–66.

As remedies for the harms associated with the claims sustained, the Court granted injunctive relief against both sets of defendants. *See id.* at 465–67. With respect to Shred–It's demand of compensatory damages, the Court requested additional documentation and clarification of the amounts and types of monetary recovery Shred–It sought. *See id.* at 466–67.

Shred–It submitted responsive materials providing further support for its requested damages, With respect to the breach of contract and unfair competition claims, Shred–It seeks damages totaling $741,000 in profits it allegedly lost from seven former MDS customers whose business Shred–It asserts defendants colluded unfairly to divert to EMS. (Plaintiffs' Proposed Findings of Fact, Proposed Order, and Memorandum in Support on Remedies Issues, dated November 14, 2002). EMS and Cruz submitted a response asserting essentially that Shred–It had not provided sufficient evidence to prove either that EMS and Cruz had done anything to divert any former MDS customers from Shred–It or that Shred–It had lost the business revenues it claimed as damages from EMS and Cruz. (Proposed Findings of Fact For Defendant Nitza Cruz and Executive Mobile Shredding, dated December 4, 2002.)

MDS and Bohbot submitted materials which included an Affidavit from Gerald A. Shanker ("Shanker"), a certified public accountant proffered as an expert witness purportedly to rebut the trial evidence regarding the methodology and assumptions employed by Shred–It's witnesses in their calculation of proposed damages. (Defendants' Proposed Findings of Facts and Damages, dated December 6, 2002.)

In a reply to the submission of MDS and Bohbot, Shred–It objected to their tender of Shanker's affidavit as an unwarranted reopening of the evidentiary record. (Plaintiffs' Reply in Support of Clams for Damages, dated December 10, 2002.)

## II. *DISCUSSION*

To substantiate its claim for damages due to lost profits, Shred–It introduced evidence at trial through James Thompson ("Thompson"), its vice president of finance and administration. Thompson testified that following Shred–It's purchase of MDS's assets, including its customers list and service agreements, seven former clients of MDS did not continue to employ the services of Shred–It as successor to MDS for their shredding requirements, but instead shifted their business to EMS, presumably induced to do so by the wrongful conduct of defendants.[1] Thompson ar-

---

1. The seven customers and the annualized revenues Shred–It estimates it lost from them, are as follows:

|  | Annualized | Three Months Oct.–Dec.2001 |
|---|---|---|
| Morgan Stanley | $ 86,720 | $21,680 |
| Skadden Arps | 52,896 | 13,224 |
| BNP Paribus (4 months) | 35,171 | 26,378 |
| Aristeia Records | 3,324 | 831 |
| Bank Hapoalim | 17,464 | 4,366 |
| Chase Bank | 27,780 | 6,945 |
| David Polk | 48,240 | 8,040 |

rived at Shred–It's estimate of damages by adding the revenues MDS actually derived from these seven former customers during the period of October, November and December of 2001, the last three months of services provided to them by MDS prior to the transfer of MDS's business to Shred–It in early January 2002. Annualizing the total revenues of $81,464.00 so received during those three months produces the figure of $271,595 in Shred–It's computation. Subtracting from this amount $35,000 corresponding to one customer (BNP Paribus) which Shred–It regained after four months, Shred–It calculates its total lost revenues from these customers at approximately $236,000 per year.

Shred–It then assumes, based on its customer retention rate of between 95 and 97 percent experienced in recent years, that it would have held each of these customers for at least five years. On this basis, Shred–It's estimate of lost revenues from the seven customers, including income not derived from BNP Paribus during the four months prior to regaining the account, totaled $1,215,000. To this sum, Shred–It applies a profit margin of 61 percent.[2] The product represents the $741,000 Shred–It seeks as damages attributable to its breach of contract claim against MDS and Bohbot and the unfair competition claim against EMS and Cruz.

■ As a preliminary matter, the Court reviews Shred–It's objection to the introduction of the Shanker affidavit by MDS and Bohbot. The Court agrees that it would be improper to admit and consider this evidence at this stage of the proceedings. The trial record closed when all sides rested at the conclusion of the evidentiary phase of the proceeding. Prior to or during trial, defendants had ample opportunity to seek leave to present a rebuttal witness to challenge Shred–It's evidence covering damages. They chose not to, and now offer no compelling reason why the trial record should be reopened. To introduce the testimony and report of a supposed expert witness at this point manifests an absence of due diligence. Acceptance of the evidence would contravene the letter and spirit of Federal Rule of Civil Procedure 26 and unduly prejudice Shred–It. *See John v. Sotheby's Inc.,* 858 F.Supp. 1283, 1288 (S.D.N.Y.1994) ("An application seeking to reopen the record is committed to the sound discretion of the district court." (citations omitted)).

■ Nor would it be justified to accept Shanker's report or reopen the record to allow him to refute Thompson's testimony on the ground that Thompson allegedly appeared as an expert witness. In fact, Thompson testified as a fact witness, a matter as to which defendants were on notice, since Thompson was identified in the Joint Pre–Trial Order as a fact witness with regard to Shred–It's alleged losses. A plaintiff is entitled to offer competent evidence from any relevant source from which damages may be ascertained with reasonable certainty; there is no obligation that a claimant support claims of damages only through expert witnesses. *See Fitzgerald Publishing Co. v. Baylor Publishing Co.,* 807 F.2d 1110, 1118–19 (2d Cir.1986); *Compania Pelineon De Navegacion v. Texas Petroleum Co.,* 540 F.2d 53, 56 (2d Cir.1976).

There is no dispute that the seven customers in question were previously served

---

**2.** This figure is based on Shred–It's actual profit and loss figures from its New York operation from January 1 to August 11, 2002, which Shred–It states produced $2,051,000 in revenues and $809,000 in expenses.

by MDS, that their accounts were included among the property subject to the Asset Purchase Agreement and that their shredding requirements were served by EMS and not Shred–It after Shred–It's acquisition of MDS was completed in January 2002. Consequently, absent some wrongful conduct or the workings of other effects on unfair competition by defendants, Shred–It ordinarily would have continued to service these customers for some period of time.

EMS and Cruz argue that Shred–It failed to establish by direct evidence that former MDS customers were diverted from Shred–It to EMS as a result of unlawful acts on the part of Cruz. The Court disagrees. The trial evidence, as the Court has already ruled, *see Shred–It*, 2002 WL 31453087, at 462 and 465–66, was sufficient to persuade the Court that: (1) MDS and Bohbot breached the Asset Purchase Agreement by continuing to engage in shredding services in the New York area either directly or indirectly in conjunction with EMS and/or Cruz, and (2) EMS and Cruz engaged in unfair competition by creating the impression that EMS was affiliated with MDS and by continuing to service former MDS customers with the use of funds, vehicles, facilities and other resources provided by MDS and Bohbot. Without this substantial involvement and support by MDS and Bohbot, it is highly unlikely that EMS and Cruz would have had the business capacity to successfully solicit and service the former MDS customers.

The evidence was more than sufficient, without direct testimony from the former customers themselves confirming that they were induced by Cruz to move their shredding business to EMS, to support a reasonable inference that the accounts would have remained with Shred–It as successor to MDS but for the combined effect of the acts of breach of contract and unfair competition in which the respective defendants engaged, and that the defendants were well aware of the relationship and consequences of their actions on Shred–It's ability to achieve the reasonable expectations it bargained for from the Asset Purchase Agreement. To this degree, the Court finds defendants' conduct to be sufficiently knowing and purposeful to constitute willful solicitation. *See Hyde Park Products Corp. v. Maximilian Lerner Corp.*, 65 N.Y.2d 316, 491 N.Y.S.2d 302, 480 N.E.2d 1084 (1985). Accordingly, the Court concludes that Shred–It did suffer some amount of damages attributable to income it would have derived from the seven former MDS customers whose accounts Shred–It lost by reason of defendants' unlawful conduct.

Turning to Shred–It's computation of damages, the Court finds that Shred–It has failed to substantiate by a preponderance of the evidence the award of $741,000.00 it seeks.

■ Shred It's calculation of damages attributable to lost profits from the former MDS customers is a function of several essential factors: (1) the total amount of revenues generated from each customer; (2) the number of years Shred–It would have serviced and derived revenues from those customers had their business not been diverted to EMS, a consideration which in turns depends upon: (a) Shred–It's customer retention rate, and (b) other pertinent market forces affecting competition in the industry, such as costs, pricing, efficiencies, technology and quality of service rendered, including EMS's and Shred–It's own performance in this regard; and (3) Shred–It's profit margin. In computing the recovery it proposes, Shred–It's analysis rests on a number of essential flaws in its methodology, and unsupported factual predicates.

First, the Court is not persuaded by Shred–It's request insofar as it posits a straight-line stream of revenues assumed to remain constant for five years. Shred–It produced no evidence to warrant an assumption either that its projection of income from the six remaining lost customers would remain at a uniform level or that this result would continue for five years. The retention number is not based on actual financial results from a comparable period. Rather, the figure appears to have been picked randomly. Thus, for all the evidence shows, the supposed duration could just as well have been seven or ten years, or two or three, as much as the five years Shred–It postulates.

Thompson did testify that the retention rate MDS and Shred–It experienced overall ranged from approximately 95 to 97 percent. However, this rate indicates, conversely, an annual attrition of customers of between three and five percent per year. But Shred–It's proposal assumes in effect that during the next five-year period, despite an acknowledged annual lost account rate of this magnitude in Shred–It's customer base, somehow every one of the six former MDS customers would be unaffected by any market forces and survive attrition through normal competition or other business influences, and yield Shred–It an invariable revenue stream during each of the next five years.

The probability of Shred–It's retention of the former MDS customers for the entire five-year period actually depends upon a much more rigorous mathematical inquiry and greater factual inputs than Shred–It's simple straight line formula presents. Assuming the annual retention rate of 90 to 97 percent Shred–It supposes, by the end of the fifth year the total customer base would have experienced an overall turnover of between 15 and 25 percent. Whether all of the six former customers would still remain on the list at the end of each year is a function of whether the proportion of the total number of Shred–It customers they comprise is higher or lower or remains the same. If the customer base at the starting point declines or remains substantially level, every year the likelihood that all of the six former customers in question would survive attrition should diminish. For each of them to remain among the accounts still retained after five years would require an enlargement of the original base that would yield that probability. Shred–It assumes this result, but its analysis contains no corresponding evidence from which this projection may be compellingly deduced. To be sure, the calculation of damages is not an absolute mathematical science; it does not demand atomic precision. But neither does the law authorize compensation for injury to be grounded on palpably flawed method, inadequate factual support or sheer conjecture. *See Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234, 235 (1986); *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 412 N.Y.S.2d 589, 385 N.E.2d 281, 283 (1978).

In fact, Shred–It's projection also presupposes that the same competitive factors and other market forces that already operated to enable Shred–It to regain the account of BNP Paribus, would not work to Shred–It's advantage and, over the course of the next five years, allow Shred–It similarly to recapture some of the other former MDS customers from EMS. By the same token, Shred–It's hypothesis is faulty because it also presumes that EMS itself would experience no attrition affecting the six remaining customers in question and indeed that EMS would survive as a business for the entire five-year period. It is common knowledge that start-up businesses, especially small companies, typically encounter financial and operational diffi-

culties during their first years. These ventures are prone to experience a higher attrition rate during this formative· stage before functional capacity and business relationships begin to settle at more sustained levels. It is therefore unwarranted to negate the prospect that during EMS's first five years none of the remaining former MDS customers would return to Shred–It, especially if Shred–It were to pursue the accounts aggressively, as its own performance, reputation and market force becomes established in the industry.

█ Second, Shred–It's revenue projection posits an annualization of the revenues MDS derived from the lost customers during the final quarter of 2001. However, Shred–It produced no persuasive evidence from a more extensive record of MDS's prior performance spanning any period extending over entire years, to back a finding that those three months constitute a representative sample and sufficient foundation upon which to base a reliable forecast of revenues remaining constant for the next five years. Nor does Shred–It's evidence rule out an equally plausible assumption that those three months, given that they represented the end of the calendar year as well as the last full quarter of MDS's operation and servicing its accounts, were aberrational. There was much in the circumstances that could support a reasonable conclusion that MDS's financial results for those months could have been atypical, including MDS's normal end-of-the year incentive to maximize income and collect its accounts receivables before turning over its assets and operations to its successor.

Shred–It does endeavor to buttress the apparent weakness in its analysis by introducing evidence of the income EMS actually received from the seven former MDS customers during a four-month period in early 2002. From that record it seeks to extrapolate some corroboration of its premise that the revenues Shred–It would have earned from those accounts actually were diverted to EMS. But the comparison does not appear to support Shred–It's case, or at best is ambiguous. According to Shred–It's analysis, the estimated annualized revenues it projects on the basis of the last three months of MDS's income records and on four months of EMS receipts from the same customers, would be $271,000 and $213,000 respectively, prior to excluding the revenue attributable to BNP Paribus. Shred–It does not explain the substantial discrepancy.[3] The difference, however, is consistent with a fair inference that MDS's revenues from the former customers for the last three months of 2001 were not necessarily representative of the entire year, and therefore do not constitute a sufficient grounding for an assumption that that brief financial result during a unique period would predictably characterize performance over the entire year, or the next five years.

Third, the Court notes a discrepancy between the list of MDS accounts identified by Joseph David ("David"), Shred–It's New York City General Manager, as having moved to EMS, and the itemization introduced by Thompson, who testified that his estimate was founded on information supplied to him by David. (*See* Pl's. Trial Ex. 6.) David's list contains six customers, one of which, Young & Rubicam,

---

**3.** Shred–It's evidence of the estimated lost revenues based on EMS receipts is as follows:

| | Four Months | Annualized |
| --- | --- | --- |
| Morgan Stanley | $22 | 66 |
| Skadden Arps | 4 | 12 |
| BNP Paribus | 25 | 75 |
| Aristera Records | 2 | 6 |
| Bank Hapoalim | 5 | 15 |
| Chase Bank | 11 | 33 |
| Davis Polk | 2 | 5 |
| | $71 | $213 |

does not appear among the seven included in Thompson's analysis. In turn, Thompson's projection reflects two customers, Chase Bank and Davis Polk, not identified on David's list. David's enumeration also makes reference to amounts of lost revenue "per period," totaling $34,500, without any further indication of what time frame the period mentioned encompassed, or how these figures relate to the particular three-month revenues recorded in Thompson's computation.

■ Finally, Shred–It's five-year revenue projection assumes a profit margin of 61 percent based on Shred–It's actual financial performance during the first half of 2002. Shred–It correctly argues that defendants did not dispute or present any evidence at trial to rebut this figure. However, neither did Shred–It provide factual support grounded on more than its own income results during the first seven months of the current year to sustain a reasonable inference that the contribution margin of 61 percent it applies to calculate asserted damages would remain constant for each of the next five years.

The Court finds that the brief span employed by Shred–It as a basis to project lost profits is simply too limited for this purpose. The profit rate prevailing for only a portion of one year, especially during a period that encompassed a substantial business acquisition by Shred–It, offers no dependable indicator of what the profit pattern and trend may reflect over a sufficiently reliable period of actual past results to justify a reasonable assumption that such performance would continue for a comparable time into the future. This method would compel the Court to speculate rather than to extrapolate, to look ahead and endeavor to reach a fair approximation of what might have been that is founded not on a proven record of sustained results, but on the outputs of a mere fragment of recent time. Specifically, offering little more than a snapshot of financial performance extending less than one year with regards to both assumed lost revenues from the former MDS customers and to Shred–It's profit margin, Shred–It in essence then takes the quantum leap it proffers in its estimate of damages.

The conceptual flaws in Shred–It's premises and approach may be summarized in general terms. It presumes that all of the vital business conditions affecting revenues and net profits or losses from the former MDS clients that prevailed at the particular moment Shred–It's picture has captured will similarly hold still for each of the next five years so as to yield Shred–It a constant gross revenue and net profit stream during that entire period. The weakness in this analysis is fundamental. The world of time and events, in business no less so than in any other aspect of life, is not as static and rectilinear as Shred–It would have it. In fact, as has already occurred here, Shred–It's own presence in the industry and business actions, together with MDS's former ties with the customers in question, have already combined to alter the governing time and space equation among these parties and participants so as to suggest other probabilities, the dynamics of which would render it more unlikely than not that Shred–It's lost profit projections will hold true for the duration Shred–It assumes. For the reasons discussed above, absent more concrete evidence Shred–It failed to produce, the Court denies the request for damages in the amount Shred–It proposes.

■ The Court next considers its determination of the appropriate amount of damages that may reasonably be ascertained and supported by the evidence. In this regard, the Court concludes that, based on the evidentiary record, any

award that is grounded on an assumption that all of the forces affecting Shred–It's projected lost revenues from the six remaining MDS customers now serviced by EMS would prevail for more than one year would be too speculative and not reasonably supportable by a preponderance of the evidence on the record. The Court adopts a one-year basis as a reflection that Shred–It has not sufficiently met its burden to prove its assumption that the various relevant factors would remain constant for five years. Rather, on the record before the Court, assessed in the light of reason, real-world experience and common sense, the Court finds that those considerations are more likely to prove materially variable enough over a period exceeding one year as to require the Court, in order to endorse Shred–It's theory, to engage in unwarranted speculation not grounded on any compelling evidence presented to it. The task the law entrusts to support sound judgment commands no less rigor.

Accordingly, accepting Shred–It's evidence of one year of lost revenues totaling $236,000 attributable to the six former MDS customers in question, and a profit margin of 61 percent, the Court awards Shred–It damages on it's breach of contract and unfair competition claims in an amount of $143,960.00, plus prejudgment interest at the New York statutory rate from the date the wrongful conduct commenced. For the purpose of calculating interest, the Court finds the record establishes the earliest date that a breach of contract and unfair competition occurred to be from late February to early March 2002. This period corresponds to the time when Bohbot undertook to assist Cruz and EMS to establish themselves in business in a manner and market defendants knew or could reasonably have foreseen would compete with Shred–It for MDS's former clients' shredding business.

### B. *PROMISSORY NOTE*

The Court found MDS liable to Shred–It under the terms of the Promissory Note between the parties in the principal balance of $200,00.00 plus interest at seven percent running from February 1, 2002. *See Shred–It*, 228 F.Supp.2d at 462–63.

### C. *FRAUD DAMAGES*

The Court also found MDS and Bohbot liable on Shred–It's fraud claim relating to these defendants' failure under the terms of the Asset Purchase Agreement to provide contract property free and clear of all liens and encumbrances, unlawful conduct that exposed Shred–It to litigation by the Bank of New York claiming $677,000 in an action pending in this Court. *See id.*, at 463–64. Because the merits of that action have not been resolved, it is not possible to determine at this time the extent of any damages Shred–It might incur as a consequence of the breach found in the action at hand. Nonetheless, the Court may adjudge MDS and Bohbot liable to Shred–It for damages in the amount of any final judgment Shred–It is held liable to pay the Bank of New York arising out of the same circumstances constituting these defendants' fraudulent conduct in the instant case.

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that judgment in an amount of One Hundred Forty Three Thousand Nine Hundred Sixty Dollars ($143,960.00), plus prejudgment interest at the New York State statutory rate from March 1, 2002, be entered against defendants Mobile Data Shred, Inc. and Michael Bohbot with regard to the claim of plaintiffs Shred-it USA, Inc. and Shred-it Canada,

Inc. ("Shred–It") for breach of contract; and it is further

**ORDERED** that judgment in an amount of One Hundred Forty Three Thousand Nine Hundred Sixty Dollars ($143,960.00,) plus prejudgment interest at the New York State statutory rate from March 1, 2002, be entered against defendants Executive Mobile Shredding and Nitza Cruz on the claim of Shred–It for unfair competition, and it is further

**ORDERED** that defendants' liability for damages set forth above with regard to Shred–It's breach of contract and unfair competition claims shall be joint and severable; and it is further

**ORDERED** that MDS and Bohbot shall be liable to Shred–It for the principal amount and any pertinent interest, costs and fees awarded to the Bank of New York in any judgment rendered against Shred–It in the action captioned *Bank of New York v. Shred–It*, No. 02 Civ. 5948, arising out of the failure by MDS and Bohbot to provide to the Bank of New York assets free and clear of all liens and encumbrances in connection with business loans encompassed by the terms of the Asset Purchase Agreement that this Court has determined MDS and Bohbot violated; and it is further

**ORDERED** that Bohbot and MDS shall honor the terms of the Asset Purchase Agreement, including the non-competition and non-assistance covenants contained therein. To this end, Bohbot and MDS are enjoined from (a) providing any form of assistance, financial, advisory, or otherwise, to Nitza Cruz, Executive Mobile Shredding, or any other person or persons in the operation, planning, or management of any shredding services in the United States or Canada; or (b) soliciting, communicating with an intent to solicit, or attempting to entice away any person having business dealings with Shred–It in North America: and it is further

**ORDERED** that Cruz and EMS are permanently prohibited from (a) using the MDS name, (b) stating or implying that they are affiliated with MDS, (c) soliciting work from any current Shred–It customers that were served by MDS when Cruz was an agent of MDS; and (d) collaborating with MDS or Bohbot on any aspect of the shredding business in North America. Cruz and EMS shall affirmatively state to any EMS customer known to have been formerly serviced by MDS that Cruz and EMS are not affiliated with MDS and that Shred–It is the successor-in-interest to MDS in the New York City area; and it is finally

**ORDERED** that Shred–It's claim in this action asserting tortious interference with contracts, misappropriation of trade secrets, deceptive trade practices, unjust enrichment and conversion are dismissed.

The Clerk of Court is directed to close this case.

**SO ORDERED.**